[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This litigation originates by virtue of a complaint, formulated in two counts.
The first count, alleging a breach of contract on the part of the defendant in essence asserts that the named parties herein entered into a contract, on or about August 14, 1985 to furnish materials and labor for the plaintiff.
The plaintiff, a general contractor, hired the defendant, as one of many sub-contractors, to do certain concrete work for the west expansion parking structure at the Trumbull Shopping Park in Trumbull, Connecticut. This defendant sub-contracted to do some, but not all of the concrete work for this project.
The dollar value of the contract between the plaintiff and the defendant, approximated more than one million dollars, including four change orders which added to that base contract price.
The over-all contract value between the plaintiff, general contractor and the owner of the shopping mall, where CT Page 599 the added construction was to be performed was in the area of three million dollars. Admittedly, the portion of the work contracted for between the parties hereto was an important part of the project.
It is further asserted that the plaintiff fulfilled all the provisions of the agreement on its part, including payments to the defendant in the undisputed amount of $959,259.00.
The plaintiff claims that the defendant's work on the concrete was unskillful and negligent and accordingly is in breach of its contract with the plaintiff.
It is further alleged that the defendant was dismissed from the plaintiff's employ after refusing to comply with the plaintiff's instructions to perform in compliance with the contractual terms.
As a result of the defendant's failure to do the work as required, the plaintiff asserts that it was compelled to finish the work and supply necessary materials at its own expense. It is claimed that this cost substantially exceeds any claimed moneys due to the defendant.
It is to recover this excess money, or excess cost for which the plaintiff has instituted this action.
The second count of the complaint is essentially a re-assertion of the allegations of the first count, except that it sounds in negligence. The plaintiff claims herein that the defendant breached its duties in the performance of its contractual obligations, thereby imposing upon the plaintiff the burden of completing what was the defendant's job in the first instance, again at a cost in excess of any moneys owed by the plaintiff to the defendant.
In essence, the answer of the defendant denies the essential allegations of the complaint and has appended thereto two special defenses: the first asserts that the plaintiff by its own negligence, caused any damage to itself because it directed, accepted and participated in the work being done; and the second special defense is a restatement of the first special defense, except that it declares that the plaintiff waived any rights to maintain this action, and for the same reasons above-stated.
In addition to the responsive pleadings by the defendant, it has filed a counterclaim of five counts. In a concise compilation of the allegations of the first count it is asserted that a balance of $77,041.00 is due the defendant on CT Page 600 an over-all contractual valuation of $1,036,300.00; count two essentially re-states the allegations of count one; count three asserts that a mechanics' lien was placed on the subject property, dated September 1, 1986 for the sum of $77,041.00 which was later released for a substituted bond in the same amount; count four asserts that the parties entered into a contract to perform work and provide materials on a separate project from that indicated above and on which the balance due is $30,210.00, the over-all price thereof, including change orders being in the sum of $149,700.00. Count five is essentially a re-statement of the allegations in Count 4.
The plaintiff has denied all of the special defenses, as well as the essential allegations of the counterclaims, in its five counts.
Comprehensively, this litigation concerns itself with the claims and cross-claims for moneys due to and from the named litigants.
It further concerns itself with two separate construction projects — unrelated to each other — and for different owners. Obviously, the plaintiff — general contractor, and the defendant — sub-contractor, — are the same litigants herein.
The first project is known as the Trumbull Shopping Mall, or the Mall, and the second project is the Westport Motel, i.e. the Motel.
The first project was covered by a contract executed on August 14, 1985, and the second project was encompassed by a contract which was signed by the parties on February 20, 1986.
Both parties are in disagreement as to the date on which the defendant discontinued working on either or both projects; or in the alternative, when the defendant's services were terminated, or if they were terminated by the plaintiff under any provisions of the contract, dated August 14, 1985 and relating to the Mall as distinguished from the Motel.
On September 9, 1986, the defendant filed a mechanics lien against the Mall property to secure the sum of $77,041.00 claimed to be due to it for work and materials furnished under that contract.
The instant action was commenced in March of 1987, post-dating the filing of the defendant's mechanic's lien by approximately six months. CT Page 601
Again, the issue before the court is the amount of money owed to either litigant and the difference in these amounts, if any.
At the request of the plaintiff and the defendant, the Court has viewed the premises, i.e., the Mall, as it relates to the work done or not done by either party, whether done satisfactorily or not.
The Court has examined the testimony in this case, as well as the many exhibits on file.
The Court has also studied and re-studied the thoroughly well prepared briefs which have been submitted.
The plaintiff asserts in the first of its two briefs that "the cause of action between the above parties is for breach of contract, i.e., Count 1: BREACH OF CONTRACT.
The Court queries whether it was the intention of the plaintiff to abandon its quest for relief on the remaining count which is captioned: Count II: NEGLIGENCE.
This may very well be evidenced by one or all of three reasons. One, the failure by the plaintiff to allude to this count in its brief; two, the failure by the plaintiff to offer even a minimal amount of evidence in support of that count; and three, the specific indications by the plaintiff in its brief that this action is for "breach of contract."
Nevertheless, the Court will embrace both counts in its holdings to the extent that it becomes pertinent to do so. It would appear, however, that the resolution of the issues raised by the one count might very well be dispositive of the issues, if any, raised in the second Count.
The core of this litigation concerns itself primarily with the provisions of the Mall sub-contract between these parties, which absorbs within its terms, an earlier contract between the named plaintiff, the general contractor, and the owner of the subject premises, i.e. Westfield Inc. For reasons of brevity, the latter, where it becomes necessary to do so, will be referred to as the "owner".
This latter agreement, the over-all contract will be referred to as #1, and the sub-contract will be referred to as #2.
An examination of contract #2 would indicate that the defendant obligated itself to perform some — but not all — of CT Page 602 the concrete work for the "Mall" project, for the plaintiff.
Although, contract #2 spells out the work which the defendant was to perform, and the materials it was to furnish, the dispute herein, develops in a very substantial measure from the use and interpretation of the word "finish" as it relates to the concrete work done by the defendant, and its final form and appearance.
This contract, in a segment thereof, which is labeled Article 2.1 appears to spell out in columnar form, on its left side, the various names or descriptions of the work to be done. It further columnizes on the opposite side, and in some sort of code fashion what was to be done by the defendant as it relates to the titles or descriptions of the work. This column uses the following code letters, F, P, Fin, as well as E.
In a manner similar to a footnote and described as a "Key" to the abovementioned code letters there is spelled out the following words: FIN = Finish (acceptable un-rubbed surface). The other code letters were also defined with a few words.
The plaintiff argues that this combination of words means that the defendant's contractual obligations would not be complete or satisfied until its work was accepted as "required by the contract."
The plaintiff asserts that since the defendant's work was not "acceptable — unrubbed surface" as required by contract, it was then entitled to introduce into the project pattern an entirely new and different procedure, in order to make the defendant's work product acceptable to the owner. This added process is known to the industry as "rubbing".
"Rubbing" is a term of art in the concrete industry which refers to the application of a thin layer of coating to concrete in order to give it a uniform appearance.
The Court finds nothing in the agreement that the defendant was responsible for any "rubbing" that the plaintiff chose to furnish; nor was there any testimony, expert or otherwise, and acceptable to the Court, that the only solution to making an unrubbed surface acceptable was via the "rubbing" route.
The Court finds nothing in the instrument — which was prepared by the plaintiff — either inferentially or otherwise that the defendant was now called upon to inject into its work an entirely independent procedure, regardless of its cost. CT Page 603
The plaintiff acknowledges in its brief that the defendant was not affirmatively required by the terms of the contract to rub all surfaces.
However, it asserts that no rubbing would be necessary if the defendant had poured the concrete in such a manner that the unrubbed surface would be acceptable.
Although this contention, ingenious as it may be, is not sufficiently convincing, so as to impose liability on the defendant for the cost of a brand new process — which is not mentioned in the contract, and which it did not specifically agree to do, or to obligate itself in that regard. The plaintiff seeks to fasten upon the defendant the responsibility for the costs of some extended "rubbing" procedure, which it has subjectively opined as being the only remedy available to it. All of this in the absence of any credible expert testimony in support of that opinion, or regardless of how disproportionate the expense is to the cost of the primary job.
The Court is aware that the contract between the parties was prepared by the plaintiff and is further aware that the plaintiff is a large construction company which is accustomed to becoming involved with projects of this magnitude, as distinguished from the size of the defendant which is not similarly experienced. The Court would infer that the plaintiff has been on other occasions, a party to similar agreements where this question, i.e., "rubbing" may very well have arisen or been foreseen.
The Court would hold that any ambiguities created by the provisions of a contract drawn by the plaintiff should be construed against it. See, Sturman v. Socha, 191 Conn. 1, 9
(1983).
The plaintiff has asserted that the correction of this condition which it finds unacceptable, now becomes a contractual obligation of the defendant, in order to satisfy the owner.
In its effort to fasten upon the defendant the costs of the rubbing which the plaintiff claims to have performed, it relies on an exhibit of the defendants which indicates on its face that it "hired four masons to chip, rub, grind, and patch — four men under garage, two men on top of deck patching spandrel." The defendant explains that the use of these words is only in its generic sense and was not intended to indicate thereby an assumption of liability which it had not otherwise contracted for. CT Page 604
The Court, in the absence of any clear convincing testimony to the contrary, is not inclined to accept the words as used in that exhibit as an intention to create a liability that does not otherwise exist. Especially so, since the contract in question, i.e. No. 2 was prepared by the plaintiff and any ambiguity or lack of clarity should not be attributed adversely to the defendant. Id., at 9.
The Court finds no provision in either contract #1 or #2, whether by, specificity or by inference, that the defendant must assume greater burdens than he agreed to merely to keep the owner happy and satisfied.
To the contrary, however, contract #2 embraces specific provisions calling for the defendant's work to be fully completed in accordance with both contracts.
The provisions contained therein are clear in that they call for satisfaction on the part of the architect, who in turn will determine what payments, based on the amount of work done, will be made to the plaintiff. And, the plaintiff will in turn, determine what payments will be made to this defendant, based on what work it has done.
It would appear to the court that the "owner", other than being a principal party to the contract with the plaintiff, nevertheless divested itself from direct and active control of the project, and placed complete responsibility in the hands of its architect, as to acceptability of the work and as that acceptability related to the time and amounts of payment, from the owner to the plaintiff.
Nor is there any adequate or acceptable evidence by testimony or exhibit directly linked to the architect as to whether or not he did in fact question the quality of the work done, or who was in fact responsible for any segment thereof, i.e., the "rubbing".
It would seem that since so much of the "final say" as to the satisfactory completion of the project was vested in the owners architect, that the failure either to produce him, or any certificates which he may have issued in which he approved contractual payments, or any correspondence whatsoever as it may have mentioned the quality or quantity of the work or any comment related thereto, is indeed significant.
The plaintiff, in a seemingly gratuitous gesture of sorts, has asserted that the defendant's problems might well have been occasioned by the fact that it was not accustomed to CT Page 605 becoming involved with construction projects of this magnitude.
If this were true, in whole or even in part, of necessity an inference would spontaneously erupt, that the plaintiff itself, is accustomed to contracting for large jobs of this size. And, if this is so, it would appear to the Court, that a general construction company, the size of which is by inference accustomed to handling large projects could and should produce detailed records of a more qualitative character than seems to be the situation in this case.
The plaintiff was directed by subpoena to produce the daily log of this job. This record, which is common to all construction projects and is generally kept by the general contractor as well as the sub-contractor is maintained to indicate where specific work was performed each day and by whom. A diary — that should disclose information that would be helpful to court — that was never produced.
It would likewise appear to the Court that this daily log, in and of itself would be dispositive of many issues raised by this litigation.
To say by the president of this plaintiff company — that he looked but could not find the daily log, challenges the credulity of this court.
It would seem that a company such as the plaintiff, would have duplicate records, or at least some alternative
The Court has been unable to glean from exhibits offered by the plaintiff, in many cases nothing more than scribbled notes, just what work was done by it for the defendant, as distinguished from work performed by it for other sub-contractors.
The Court is impelled to the adverse conclusion that had the log been produced, had the time sheets which were provided been more definitive as to the parties in this case, they would have been negatively inconsistent, with plaintiff's position here in.
The Court holds that the defendant should be liable to the plaintiff for such work and materials contributed by the plaintiff to complete or correct the work for which the defendant was contractually responsible, and more specifically as it relates to the north and south stairs.
There appears to be a tacit acknowledgment on the part of the defendant, that neither of these segments of the CT Page 606 over-all job, i.e., the north-south stairs, were properly or fully completed. It seems that the defendant was standing by, anticipating hopefully, that these parts of the job would be acceptable to the concerned governmental agency, which would, in turn make any further work unnecessary.
The defendant has conceded, that there was remedial work remaining to be done by it on both the north and south stairs.
The plaintiff claims to have completed this work and proffers for the aid of the Court the only figures to substantiate the cost thereof.
It is fundamental in our trial procedure that the burden falls upon a party to establish by a fair preponderance of the evidence, the damages to which it claims to be entitled. See, Hallmark of Farmington v. Roy, 1 Conn. App. 278, 281 (1984).
The Court is not required to surmise or conjecture on that score.
However the defendant, in the factual situation with which we are here confronted, denies that the plaintiff did any of the corrective work, and fails to show by its own testimony, acceptable to the Court, what the fair and reasonable cost was, or should have been.
The Court has scoured the records and briefs, and finds that they fail to demonstrate on the part of the defendant, a clear, acceptable or plausible indication of the dollar value of the work and materials contributed by the plaintiff, if any.
The Court finds that the plaintiff did in fact provide remedial work for which the defendant is properly chargeable. The court finds that amount to be in the sum of $39,150.00.
Although there are several other items for which the plaintiff seeks to fasten the cost upon the defendant, the Court would hold that the plaintiff has failed to prove its allegations, and more specifically its damages by a fair preponderance of the evidence, or with the required measure of specificity.
It is found that the plaintiff is entitled to recover from the defendant, on its complaint, the sum of $38,300.00.
An examination of the counterclaim assigned by the defendant discloses that it would be entitled to the sum of $63,261.00 as per provisions of the "Mall" contract. CT Page 607
The Court finds further that the defendant is entitled to recover the sum of $25,165.00 plus statutory interest at the rate of ten percent, on the "Motel" project. This interest to accrue from July 31, 1986.
Judgment may enter for the plaintiff to recover of the defendant, the sum of $38,300.00, plus costs.
Judgment may enter for the defendant on its counterclaim in the sum of $63,261.00, plus the sum of $25,165.00, plus interest of ten percent on the latter amount only, beginning July 31, 1986.
The court further awards to each litigant the sum of $7,500.00, as attorney's fees.
MILTON J. HERMAN, STATE TRIAL REFEREE