[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiffs, Robert and Caroline Strouth, seek monetary damages from the defendant Pools By Murphy Sons, Inc. (Pools) in three counts — unfair trade practices, breach of contract, and unjust enrichment. Pools has counterclaimed for breach of contract. The Strouths CT Page 10443-bi withdrew their complaint as to Green Tree Financial Servicing Corporation (Green Tree). However, Green Tree maintains crossclaims against Pools sounding in breach of contract. Because all parties agreed that the crossclaims of Green Tree are likely to be resolved shortly after a judgment issues from this proceeding, the court has allowed a bifurcation of the trial. The crossclaims of Green Tree have been reserved. They will not be dealt with in this memorandum. The court heard testimony on May 31, June 5 and June 7, 2001. In addition, the court had the benefit of the parties' stipulation of facts dated February 8, 2001, and the parties' proposed findings of fact.
The more credible evidence leads to the following factual conclusions. On May 19, 1998, and since that date, the Strouths have been owners of a residence at 1212 South Grand Street, West Suffield, Connecticut (the property). Pools was and is a Connecticut corporation in the usual business of constructing swimming pools on residential properties. Dennis Murphy is the owner of the business. In May, 1998, the Strouths were interested in installing a swimming pool in their yard. The first company they contacted was unable to proceed quickly enough to suit the Strouths' preferences. After seeing the Pools ads in newspapers, the Strouths contacted Pools to build an inground swimming pool at the property. The salesman for Pools in May, 1998, was Ed Carter. He visited the property and met with the Strouths on May 19, 1998. After Carter showed a color brochure to the Strouths depicting various shapes for pools and spas, the Strouths decided upon a peanut-shaped pool with a circular six-foot interior spa. They informed Carter of this choice.
Carter drew a contract for signatures on that date for the construction of a "custom"-shaped pool, 40 feet long by 20 feet wide, 560 square feet, perimeter 97 feet, depth three feet to six feet (later changed by mutual agreement to three feet to seven feet). Start date for construction per the contract was to be Wednesday, June 3, 1998; finish date was to be Friday, July 3, 1998. The pool was to contain a "custom spa" of six feet. Several features of the pool were highlighted in the contract, including but not limited to, a Purex filtration system, a Purex heater, underwater lights, an underwater bench in lieu of a ladder, and an automatic pool cleaner. The total price was $27,555. The Strouths paid a deposit on May 19, in the amount of $580. The contract stated that it was "Contingent on finance approval" and that there was to be "Contact for Loan consolidation". Attached to the contract was a notice of cancellation, also signed by the Strouths, notifying the Strouths that they could cancel the transaction no later than midnight June 10, 1998. CT Page 10443-bj
The use of the word "custom" to describe the shape of the pool in the contract is an ambiguity. It can describe a kidney-shaped pool or a peanut-shaped pool or any shape other than rectangular. The Strouths believed that they were contracting for a peanut-shaped pool. Pools subsequently interpreted the contract as calling for a kidney-shaped pool. "[W]hen two or more meanings may fairly be given to language in a contract, the language is to be construed against the one who drew it."Sturman v. Socha, 191 Conn. 1, 9, 463 A.2d 527 (1983). Pools drew the contract.
No plan or sketch of the proposed pool was attached to the contract. However, Carter provided to the Strouths on May 19, a black and white one-page leaflet depicting a "17' x 34' Free Form Shaped Pool". The pool pictured in that leaflet is kidney-shaped. The leaflet states a price of $17,900 "as advertised". Carter also provided a glossy color brochure depicting finished inground pools and pools in a progression of construction. Only one page of the brochure uses the term "custom pools" as a caption to a photo of a pool. That photo is of a pool roughly of a peanut shape with a rounded spa in the interior of the pool. No price appears on that page of the brochure. The parties entered into a contract on May 19, 1998, for construction of a peanut-shaped pool, 40 feet long by 20 feet wide, with an interior circular six-foot spa.
On May 19, 1998 Carter and the Strouths also completed an application for financing in the amount of $26,975. Green Tree was the proposed lender. Shortly thereafter, the Strouths decided to consolidate debts with the same loan. They increased the amount of the requested loan to $50,995.36. They provided necessary credit card information on May 30, executed the loan documents on June 9, and were sent the first check ($9,441.25) on July 16 (although the check was actually dated June 25, 1998). Pools began excavation work at the property July 16, 1998. The first check was paid over to Pools by Mrs. Strouth on July 17, 1998. Although the contract called for commencement of the construction on June 3, Pools was justified in waiting for the first lump sum payment before commencing work. Pool's actual start date of July 16, was reasonable and was in keeping with the contract.
In mid-July, the Strouths purchased sand at a cost of $122.96 to line the propane gas tank hole and they purchased special fencing at a cost of $1,054.42 for the pool area. They also had a rented propane tank delivered to the property. Unaccountably, they kept the propane tank for several months before causing it to be removed from the property. Neither the sand nor the fencing could be used by the Strouths for the intended CT Page 10443-bk purpose because the pool was never completed.
When Dennis Murphy arrived at the property on July 16, 1998, to commence excavations, he showed Mrs. Strouth a picture of the kidney-shaped pool he planned to dig and he laid out staking. Dennis Murphy knew to excavate a kidney-shaped pool because the contract provisions of 560 square feet and perimeter of 97 feet for a pool 40 feet in length by 20 feet in width described to Pools a kidney-shaped pool. Since a "custom" shape meant any shape other than a rectangular shape, the excavator needed to look at the area and perimeter dimensions on the contract to know what shape to dig. Mrs. Strouth told Dennis Murphy that the picture he was showing her did not look like the pool she was expecting. Murphy assured her that the pool would look like her expectations when completed. She signed a form approving the position of the pool in the yard. Because the excavator hit ledge when digging for the pool, it was necessary to reposition the pool in the yard. Instead of a pool roughly parallel to the back of the house, the new position was roughly perpendicular to the house. Pools did not get Mrs. Strouth to sign an additional form approving the new position of the pool. The excavation took two days. Pools laid out a kidney-shaped pool. Such a configuration was a substantial deviation from the shape of the pool for which the Strouths contracted. Within a couple of days thereafter a crew arrived to install the steel frame (rebars); also, the electrician and the plumber did work at the property. The rebars outlined an almond-shaped spa, not a circular spa.
Before any gunite was poured, the Strouths received the bill of Pools for the additional excavation time incurred when Pools hit ledge the first day. Mr. Strouth telephoned Pools. Speaking to Joseph Murphy, father and employee of Dennis Murphy, Mr. Strouth complained about the extra bill. After a short acrimonious conversation, Joseph Murphy abruptly terminated the conversation. Although the Strouths felt the pool as excavated was not in the shape they had contracted for, Mr. Strouth did not have an opportunity to complain of this fact in that telephone conversation because Joseph Murphy hung up on him.
Four days later on July 30, Mr. Strouth telephoned Pools to order them to discontinue all work at the property. The Strouths sent a letter to Green Tree on July 30 advising Green Tree that they had obtained an attorney and had ceased construction of the pool. Thereafter, Carter telephoned the Strouths several times to try to work out a completion of the pool. On September 20, 1998, Pools caused a letter to issue in which Pools offered to complete the pool at the property with a circular spa. There was never an offer to reconfigure the pool to a peanut shape. The CT Page 10443-bl Strouths were not obliged to have a pool built or completed in their backyard that did not conform to the pool for which they contracted. Substantial additional work would have been needed to complete the kidney-shaped pool. The excavation, albeit in a deteriorated condition, remains in the backyard at the property today. It is a detriment, not an asset, to the property. The partially built pool is of no value to the Strouths. The Strouths put forward no evidence concerning possible costs of filling in the excavation or grading and landscaping the backyard. The Strouths have not yet decided what to do to remediate the hole in their yard.
Failure to build the pool in a peanut shape with a circular interior spa was a breach by Pools of the contract between the parties. Although Carter may have made a bad bargain in the drawing of the contract and may have misled his company as to the proposed shape of the pool, that mistake was not of the Strouths' making. They bargained for and were prepared to pay for the pool in the contract. The Strouths acted with justification in terminating additional construction of a kidney-shaped pool.
Pools was not enriched unjustly by these events. Pools expended considerable time, effort and resources to begin building the wrong pool. The Pools interpretation of the contract was mistaken, but was not an unfair or deceptive practice. "Whether a practice is unfair and thus violates CUTPA is an issue of fact." DeMotses v. Leonard SchwartzNissan, Inc., 22 Conn. App. 464, 466, 578 A.2d 144 (1990). There was no evidence adduced to show that Pools' failure to build a peanut-shaped pool was anything more than an isolated breach of contract. This did not rise to the level of an unfair or deceptive trade practice.
The Strouths have been damaged in the amount of the payment made to Pools plus the costs to the Strouths of the sand and the fencing. Judgment shall enter in favor of the plaintiffs on the Second Count breach of contract in the amount of $10,618.63. Judgment shall enter for the defendant on the First and Third Counts. Judgment shall enter for the plaintiffs on the breach of contract crossclaim by the defendant. No attorney's fees are awarded to either party. The plaintiffs are entitled to costs.
Winslow, J.